## FRED SHAW v. THE STATE.

No. 2803.   Decided November 26, 1913.

Rehearing denied December 23, 1913.

**1.—Murder—Manslaughter—Charge of Court.**

Where, upon trial of murder, the evidence did not raise the issue of manslaughter, there was no error in the court's failure to charge thereon.

**2.—Same—Explanation—Charge of Court.**

Where, upon trial of murder, the evidence did not raise the issue of defendant's right to demand an explanation from the deceased, there was no error in the court's failure to charge thereon.

**3.—Same—Evidence—Character of Deceased.**

Where the State did not question the fact that deceased had served a term in the penitentiary, and this was shown by all the testimony, there was no error in refusing to permit defendant to further show this fact by the wife of the deceased.

Appeal from the District Court of Kaufman.   Tried below before the Hon. F. L. Hawkins.

Appeal from a conviction of murder in the first degree; penalty, life imprisonment in the penitentiary.

The opinion states the case.

*Fred S. Rogers,* for appellant.—On question of court's failure to charge on manslaughter:   Green v. State, 126 S. W. Rep., 861; Casey v. State, 54 Texas Crim. Rep., 587; Recen v. State, 58 Texas Crim. Rep., 457; Floyd v. State, 52 id., 103; Miller v. State, 52 id., 78; Rice v. State, 51 id., 284; Arnwine v. State, 49 id., 5; Swain v. State, 48 id., 98; Cooper v. State, 48 id., 36.

*C. E. Lane,* Assistant Attorney-General, for the State.

HARPER, JUDGE.—Appellant was prosecuted and convicted of murder in the first degree, and his punishment assessed at imprisonment in the penitentiary for life.

Appellant earnestly insists that the court erred in failing to submit manslaughter in his charge, and, of course, this in every case depends upon the evidence adduced. If the evidence presents no "adequate cause," then manslaughter does not arise.   The State's evidence would show that deceased lived in a four-room house on Mr. Crittenden's place, he and his wife occupying two rooms of the house, and Nathan Chartley and his wife, Susana, occupied the other two rooms.   About one week before appellant killed the deceased, one night Susana Chartley left her home and went to the house occupied by appellant.   He returned home with her, when Nathan Chartley had some words with his wife and appellant.   The next morning Mr. Crittenden was informed of the matter, and he went to appellant, so he says, and informed him

that he must keep off of his place. Annie McCullough says at the request of Susana Chartley she told appellant "that Susana told me to tell him not to come on Mr. Crittenden's place any more; that Nathan Hicks (deceased) had told Mr. Crittenden that he (appellant) had disturbed the peace." Joe Cleavey testified that he and deceased work at the oil mill in Forney; that deceased worked in the daytime and he worked at night. That he had requested deceased to loan him a dollar, and deceased had promised to do so that evening. That when he went to work that evening he saw deceased going down the railroad track towards his home; that appellant was a short distance behind deceased. He (Joe) called to deceased, and requested deceased to meet him at the fence. Deceased turned and started back towards him, and when he got even with appellant he heard appellant say, "Nath, you told Mr. Crittenden that I disturbed the peace out on that place and I am going to kill you," and as deceased turned around appellant fired and killed him. That deceased said nothing and attempted to do nothing. That deceased had his dinner bucket on one arm, and his pipe in his right hand.

Appellant testified that Mr. Crittenden had said nothing to him about not coming on the place again, but that Annie McCullough told him that deceased had said he had instructed his (deceased's) wife to leave the house when he (appellant) came out there; that appellant was out there running after Susana Chartley; that if he (appellant) came out there again he (deceased) was going to do him up, and that Mr. Crittenden had said for him to stay away as he was disturbing the peace. He further testified that on the day of the killing he had been hunting, and on his way home came up with deceased on the railroad track, and, to use his own language, the killing occurred under the following circumstances: "Me and Nathan we met up there and when we met up there I spoke to him, says, 'Howdy, Nath.' He says, 'Howdy.' I says, 'Say, Nath, I heard about some remarks you made about what you are going to do to me and I heard that you went and told Mr. Crittenden that I came out there and disturbed peace. I don't know whether it is so or not. Don't think hard of me. I don't mean no fuss or nothing like that; I don't want to disturb no peace with you',— which I didn't do it. I didn't aim to start no fuss with him or nothing like that; to tell the truth about it I was half afraid of him because he had already told me himself that he had been to the pen, and he would sooner go again. That is the reason I was a long time about going to have a talk with him. I says, 'If that is so, Nath, I wish you would tell me.' He says, 'Aw, nigger, go ahead.' I started to walk off from him. I says, 'No, I will ask him and see for certain whether he did do this talk.' I says, 'Nath, did you tell Mr. Crittenden that I came out there and disturbed peace?' He said to me, said, let's see, he says, 'Yes, I want you to stay away from my house.' I says, 'Well, can I not come out there for nothing? That is my own cousin I come out there to see. I ain't bothered you in any way. I don't think you are treating

me right talking around and talking about what you are going to do to me, anything that way. I don't think you treating me right.' Joe Cleavey called him; he turned and started towards Joe. I says, 'Did you tell him that, did you tell Mr. Crittenden that I came out there and disturbed peace?' He turned around and started back towards me. He says, 'God damn you, don't you like it?' I told him no, and he commenced feeling for his knife or something and started towards me. I backed off from him; he kept coming. I backed out of the track, outside in the dreen we had been cutting there, I backed out of the track; he kept coming. I says, 'Nath, you had better get back.' I told him the second time. I says, 'Get back.' He would not do it. He had his hands in his pocket this way, he was coming out with it and I shot then. He fell with both hands in his pockets. That is the way I left him, with his hands in his pocket. I told him the second time to get back."

To take the State's evidence, it is a plain case of murder, and we do not think the defendant's own testimony raises the issue of sudden anger or fear aroused by an adequate cause, and under such circumstances the court committed no error in failing to charge on manslaughter. The court presented the issue of self-defense from apparent danger, as it appeared to defendant, in a clear and lucid manner, and in a way not complained of by appellant.

The only other complaint of the charge is that the court erred in failing to tell the jury, "that when defendant saw deceased on the right-of-way of the railroad, then he had the right under the law to arm himself and go and demand an explanation." This issue was not raised by the testimony. Appellant himself testified that he had been hunting, and explained the possession of the gun in that way.

The only ground in the motion for a new trial complains of the action of the court in refusing to permit him to prove by deceased's wife that deceased had served a two-year term in the penitentiary; that he had been sent from Smith County. Appellant does not state that he expected to prove by the witness that she had informed him of that fact prior to the killing. If he had stated that he had expected to prove by the witness that she had informed him, appellant, of this fact before the killing, it would have been admissible. But it was not an issue in the case whether or not deceased had served a term in the penitentiary. The court permitted appellant to testify that he had been told by deceased himself that he had served a term in the penitentiary, and the State in no way questioned this testimony. Appellant also testified that he had been informed that deceased was a dangerous man, but the witnesses whom he questioned on this point testified that they had never heard of deceased's reputation being that of a dangerous and violent man. The testimony of the wife of deceased that he had been in the penitentiary might tend slightly to support the testimony of appellant that he had been informed by deceased that he had served a

term in the penitentiary, but as the State did not question that fact, it is not such a matter as will call for a reversal of the case.

The judgment is affirmed.

*Affirmed.*

[Rehearing denied December 23, 1913.—Reporter.]